## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## LOADCRAFT INDUSTRIES, LTD.

This Agreement of Limited Partnership of LOADCRAFT INDUSTRIES, LTD. (the **"Agreement"**) is made and entered into by and among BRADY PLANT OPERATORS, L.L.C., a Texas limited partnership (the **"General Partner"** or **"BPO"**), HEARTLAND INVESTMENT PARTNERS, LTD. (**"Heartland"**), J BAR T, LTD. (**"J Bar T"**) HUNTLAND RESOURCES, L.L.C., (**"Huntland Resources"**) HUNTLAND PROPERTIES, LTD. (**"Huntland Properties"**) and WINDOW OPERATING, LTD. (**"Window"**), as limited partners (the **"Limited Partners"**). The General Partner and the Limited Partners are also hereinafter sometimes referred to as a **"Partner"** in the singular or the **"Partners"** in the plural.

## RECITALS

KDLT Resources, L.L.C. ("KDLT") was the initial general partner of the Partnership. After the initial formation, KDLT assigned its interest as general partner to BPO. For purposes herein, BPO will be considered the General Partner.

The Partners desire to form an entity for purposes of acquiring the certain assets of HRI Oilfield, L.P., at Texas limited partnership ("HRI"), Heartland Rig International, LLC, a Texas limited liability company ("International"), Heartland Intermodal, Inc., a Delaware corporation ("Intermodal"), and Partech, LLC, a Louisiana limited liability company, ("Partech") (collectively "Sellers") covered by that certain Asset Purchase Agreement between Sellers and Huntland Resources, and consolidating the ownership of certain properties owned by the Partners in order to provide for a more efficient means of handling the ownership and management of such properties and in order to enhance the value of such properties in the future. Also, in order to provide for the centralized management of the Partnership and the ongoing management and control of the Partnership upon the death or incapacity of a family member, the parties desire to set forth provisions for the appointment of a successor general partner if the General Partner fails or ceases to serve as General Partner.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing Recitals and the mutual covenants and agreements contained herein, the Parties agree as follows:

**EXHIBIT "B"**

## ARTICLE I

### Formation

**Section 1.1. Formation**.  The parties hereby form a limited partnership (the **"Partnership"**), under and pursuant to the Texas Revised Limited Partnership Act, Article 6132a-1 of the Revised Civil Statutes of the State of Texas (the **"Act"**).

**Section 1.2. Name.** The name of the Partnership is **"LOADCRAFT INDUSTRIES, LTD."** The business of the Partnership shall be conducted in the name of the Partnership unless under the law of some jurisdiction in which the Partnership does business such business is required to be conducted under another name.  In such a case, the business of the Partnership in such jurisdiction may be conducted under such other name or names as the General Partner may select.

**Section 1.3. Purpose.** The Partnership is hereby formed for the purpose of acquiring assets, manufacturing and selling oilfield drilling equipment and other heavy machinery, and such other purposes as may be agreed upon by the Partners from time to time.

**Section 1.4. Registered Office and Registered Agent; Principal Place of Business.**

(a)    The registered office of the Partnership required by the Act to be maintained in the State of Texas shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in the manner provided by the Act.  The registered agent of the Partnership in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by the Act.

(b)    The principal place of business of the Partnership shall be 3811 N. Bridge, Brady, Texas 76825, or at such other location designated by the General Partner.

**Section 1.5. Foreign Qualification**. Prior to the Partnership's conducting business in any jurisdiction other than Texas, the Partnership shall comply, to the extent procedures are reasonably available, with all requirements necessary to qualify the Partnership as a foreign limited partnership in such jurisdiction. At the request of the General Partner, each Partner agrees to execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Partnership as a foreign limited partnership in all such

−2−

jurisdictions in which the Partnership may conduct business.

**Section 1.6. Term.** The Partnership commenced on the date the Certificate was
filed with the Secretary of State of Texas and shall continue in existence until it is dissolved
and terminated in accordance with the terms hereof.

## ARTICLE II

## Definitions and References

**Section 2. 1.** **Definitions.** In addition to the terms defined elsewhere herein,
when used in this Agreement, the following terms shall have the respective meanings
assigned to them in this Section 2.1 or in the sections or other subdivisions referred to
below:

**"Adjusted Capital Account"** shall mean the capital account maintained for each
Partner as provided in Section 7.4, (a) increased by (i) the amount of any unpaid Capital
Contributions agreed to be contributed by such Partner under Article IV, if any, and (ii) an
amount equal to such Partner's allocable share of Minimum Gain as computed on the last
day of such fiscal year in accordance with the applicable Treasury Regulations, and (b)
decreased by the adjustments provided for in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4)-(6).

**"Affiliate"** shall mean, when used with respect to a Person, any Person directly or
indirectly controlling, controlled by or under common control with such Person. For
purposes of this definition, the terms **"controlling, controlled by or under common
control"** shall mean the possession, directly or indirectly, of the power to direct or cause
the direction of management or policies (whether through ownership of securities or any
partnership or other ownership interest, by contract or otherwise) of a Person.

**"Agreement"** shall mean this Agreement of Limited Partnership, as hereafter
amended, modified or changed in accordance with the terms hereof.

**"Capital Contribution"** shall mean, for any Partner at the particular time in
question, the aggregate of the dollar amounts of any cash contributed to the capital of the
Partnership and the fair market value of any property contributed to the capital of the
Partnership, or, if the context in which such term is used so indicates, the dollar amounts
of cash and the fair market value of any property agreed to be contributed, or requested
to be contributed, by such Partner to the capital of the Partnership.

**"Certificate"** shall mean the Certificate of Limited Partnership filed by the
Partnership with the Texas Secretary of State, as amended or restated from time to time.

**"Dispose"** (including the correlative terms **"Disposed"** or **"Disposition")** shall

-3-

mean any sale, assignment, transfer, exchange, conveyance, gift, pledge, mortgage, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law.

**"General Partner"** shall mean Brady Plant Operators, L.L.C., a Texas limited liability company, and any Person or entity who becomes a substituted General Partner pursuant to the terms hereof.

**"Guaranty Obligations"** shall mean the obligations of Heartland, or its affiliates or partners, to guarantee the Working Capital Loan (as hereinafter defined).

**"Internal Revenue Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

**"Liquidation Amount"** shall have the meaning assigned to such term in <u>Section 5.2</u>.

**"Limited Partners"** shall mean Heartland, J Bar T, Huntland Properties, Huntland Resources, Window and any Person or entity who becomes an additional or substituted Limited Partner pursuant to the terms hereof.

**"Managers", "Board of Directors" "Board" or "Directors"** shall mean the Managers, or other governing body of the General Partner.

**"Minimum Gain"** shall have the meaning assigned to that term in Treasury Regulation section 1.704-2(d) and section 1.704-2(i)(3), as applicable.

**"Partner"** shall mean the General Partner or a Limited Partner, but such term does not include any Person who has ceased to be a Partner.

**"Partner Nonrecourse Debt"** shall have the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation section 1.704.2(b)(4).

**"Partner Nonrecourse Deductions"** shall have the meaning assigned to the term "partner nonrecourse deductions" in Treasury Regulation section 1.704-2(i).

**"Partnership Nonrecourse Liabilities"** shall have the meaning assigned to the term "nonrecourse liabilities" in Treasury Regulation section 1.752-1(a)(2).

**"Person"** shall have the meaning assigned to it in Section 1.02 of the Act.

**"Property"** shall mean all those certain assets purchased from Sellers pursuant to that certain Asset Purchase Agreement dated November 18, 2004 between Huntland Resources and Sellers.

**"Purchase Loans"** shall mean the promissory notes, security agreements, and other documents related to the loan from HRI as administrative agent for Sellers, to the Partnership as a part of the purchase price for the Property.

**"Treasury Regulations"** (or any abbreviation thereof used herein) shall mean temporary or final regulations promulgated under the Internal Revenue Code.

**"Unit Sharing Percentage"** shall mean as to any Partner, the percentage obtained by dividing the number of Units owned by such Partner by the total number of Units issued and outstanding at the time in question, subject to the provisions of Section 3.3.

**"Working Capital Loan"** shall mean the Loan Agreement, promissory notes, security agreements, guaranty agreements and other documents related to the loan from Community National Bank to the Partnership to fund the working capital needed for operations.

### Section 2.2.    References and Construction.

(a)    All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)    Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

(c)    The words "this Agreement", "this instrument", "herein", "hereof", "hereby","hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(d)    Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(e)    Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(f)    The word "or" is not exclusive and the word "includes" and its derivatives shall mean "includes, but is not limited to" and corresponding derivative expressions.

(g)    No consideration shall be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

(h)    All references herein to "$" or "dollars" shall refer to U.S. Dollars.

-5-

Unless the context otherwise requires or unless otherwise provided herein, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document, provided that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

Each Exhibit attached hereto is incorporated herein by reference and made a part hereof for all purposes and references to this Agreement shall also include such Exhibit unless the context in which used shall otherwise require.

## ARTICLE III

### Partners and Units

**Section 3.1  Partners.** The Partners of the Partnership are set forth in Exhibit 3.1.

**Section 3.2.  Units.**

(a)  The Partnership shall have one class of Partnership interests consisting of 100,000 authorized common Partnership interests, which shall be referred to herein as "Units".

(b)  Initially, as specifically set forth on Schedule 3.2(c), in consideration of the Capital Contributions made by the Partners, the Partnership shall issue 100 Units to General Partner, 3,000 Units to Huntland Resources, 900 Units to Huntland Properties, 4,500 Units to Heartland, 500 Units to Window and 1,000 Units to J Bar T.

(c)  Exhibit 3.2(c) sets forth the number of Units owned by each Partner after giving effect to the transactions contemplated by subsection (b) above.

(d)  Ownership of Units shall be evidenced by certificates (in this Section, **"Unit Certificates"**). Unit Certificates representing Units shall be in the form of Exhibit 3.2(d). The Partnership shall issue one or more Unit Certificates to each Partner, which Unit Certificates need not bear a seal of the Partnership, but shall be signed by an officer of the General Partner or other Person authorized to sign such Unit Certificates by the General Partner certifying the number and series of Units represented by such certificate. The Unit Certificates shall be consecutively numbered and shall be entered in the books of the Partnership as they are issued and shall exhibit the holder's name and number of Units. The General Partner may determine the conditions upon which a new Unit Certificate may be issued in place of a Unit Certificate that is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such Unit Certificate or its legal representative to give bond, with sufficient surety, to indemnify the Partnership and each

-6-

transfer agent and registrar against any and all losses or claims that may arise by reason of the issuance of a new Unit Certificate in the place of the one so lost, stolen or destroyed. Each Unit Certificate shall bear a legend on the reverse side thereof substantially in the following form:

> **THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE PARTNERSHIP SHALL HAVE BEEN DELIVERED TO THE PARTNERSHIP TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT). THIS SECURITY IS SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE AGREEMENT OF LIMITED PARTNERSHIP OF THE PARTNERSHIP, DATED AS OF NOVEMBER __, 2004 (AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT ITS PRINCIPAL EXECUTIVE OFFICES.**

**Section 3.3    Heartland's Additional Units.**  While the Partnership is initially issuing 45% of the Partnership Units to Heartland in exchange for its Capital Contribution, the Partners acknowledge that Heartland, by and through its partners, is guaranteeing the Working Capital Loan.  In consideration for its Guaranty Obligations, Heartland shall be entitled to receive additional Partnership Units based on the length of time the guarantees are outstanding. The method for determining the additional Units to be issued is set forth below, with these amounts reflected in the schedule attached as Exhibit 3.3.

(a)    If Heartland is removed from its Guaranty Obligations on or before six (6) months following execution of the documents related to the Working Capital Loan, Heartland shall be issued  an additional  1,110 Units of the Partnership, bringing its Partnership Sharing Ratio to 50.5%, with such Additional Units to be issued effective as of the execution of the Guaranty Obligations; and

(b) If Heartland is removed from its Guaranty Obligations after six (6) months but on or before twelve (12) months following execution of the documents related to the Working Capital Loan, Heartland shall be issued  an additional 1,390 Units of the Partnership, with such Additional Units to be issued effective as of the beginning of the seventh month following execution of the Guaranty Obligations,  bringing its Partnership Sharing Ratio to 56%; and

(c) If Heartland is removed from its Guaranty Obligations after twelve (12) months following execution of the documents related to the Working Capital Loan, Heartland shall be issued an additional 1,785 Units of the Partnership, with such Additional Units to be issued effective as of the beginning of the thirteenth month following execution of the Guaranty Obligations, bringing its Partnership Sharing Ratio to 61.5%.

**Section 3.4. Additional Partners.** Additional Persons may be admitted to the Partnership as Partners as provided more specifically herein.

**Section 3.5. Withdrawal of General Partner.** The General Partner shall not have the right to withdraw, resign or retire from the Partnership, except as provided in Section 6.4.

## ARTICLE IV

### Capital Contributions

**Section 4.1. Initial Capital Contributions.** The initial capital to be contributed by each Partner is set forth in Section 3.2 hereof.

**Section 4.2 Additional Capital Contributions.** The Partners shall not be required to make any additional capital contributions. The Limited Partners and the General Partner may make, but shall not be obligated to make, such additional cash or non-cash contributions as approved by the General Partner. In the event such additional capital contributions are approved by the General Partner, each Partner shall have the right to make such additional capital contributions sufficient to maintain the Partners' Unit Sharing Percentages in the same proportions as prior to the additional capital contribution. At the time of any additional contributions, the fair market value of any non-cash contributions shall be determined by the General Partner, and the Unit Sharing Percentages shall be adjusted as determined by the General Partner to take into account such additional contributions.

**Section 4.3 Interest on Capital Accounts.** No Partner shall receive any interest on his or her capital contributions to the Partnership.

## ARTICLE V

### Allocations and Distributions

#### Section 5.I. Allocations.

(a) Except as otherwise provided in Section 5.2 or as may be required by section 704(c) of the Internal Revenue Code and Treasury Regulation Section 1.704-

-8-

1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Partnership shall be allocated among the Partners in proportion to their Unit Sharing Percentages.

(b)     Notwithstanding any of the foregoing provisions of this Section 5.1 to the contrary:

(i)     If during any fiscal year of the Partnership there is a net increase in Minimum Gain attributable to a Partner Nonrecourse Debt that gives rise to Partner Nonrecourse Deductions, each Partner bearing the economic risk of loss for such Partner Nonrecourse Debt shall be allocated items of Partnership deductions and losses for such year (consisting first of cost recovery or depreciation deductions with respect to property that is subject to such Partner Nonrecourse Debt and then, if necessary, a pro rata portion of the Partnership's other items of deductions and losses, with any remainder being treated as an increase in Minimum Gain attributable to Partner Nonrecourse Debt in the subsequent year) equal to such Partner's share of Partner Nonrecourse Deductions, as determined in accordance with applicable Treasury Regulations.

(ii)     If for any fiscal year of the Partnership there is a net decrease in Minimum Gain attributable to Partnership Nonrecourse Liabilities, each Partner shall be allocated items of Partnership income and gain for such year (consisting first of gain recognized from the disposition of Partnership property subject to one or more Partnership Nonrecourse Liabilities and then, if necessary, a pro rata portion of the Partnership's other items of income and gain, and then, if necessary, for subsequent years) equal, to such Partner's share of such net decrease (except to the extent such Partner's share of such net decrease is caused by a change in debt structure with such Partner commencing to bear the economic risk of loss as to all or part of any Partnership Nonrecourse Liability or by such Partner contributing capital to the Partnership that the Partnership uses to repay a Partnership Nonrecourse Liability), as determined in accordance with applicable Treasury Regulations.

(iii)     If for any fiscal year of the Partnership there is a net decrease in Minimum Gain attributable to a Partner Nonrecourse Debt, each Partner bearing the economic risk of loss for such Partner Nonrecourse Debt shall be allocated items of Partnership income and gain for such year (consisting first of gain recognized from the disposition of Partnership property subject to Partner Nonrecourse Debt, and then, if necessary, a pro rata portion of the Partnership's other items of income and gain, and if necessary, for subsequent years) equal to such Partner's share of such net decrease (except to the extent such Partner's share of such net decrease is caused by a change in debt structure or by the Partnership's use of capital contributed by such Partner to repay the Partner Nonrecourse Debt) as determined in accordance with applicable Treasury Regulations.

(c)     The losses and deductions allocated pursuant to this Article V shall not exceed the maximum amount of losses and deductions that can be allocated to a Partner

-9-

without causing or increasing a deficit balance in the Partner's Adjusted Capital Account. If, at the end of any fiscal year, as a result of the allocations otherwise provided for in this Section 5. 1. the Adjusted Capital Account balance of any Partner shall become negative, items of deduction and loss otherwise allocable to such Partner for such year, to the extent such items would have caused such negative balance, shall instead be allocated to Partners having positive Adjusted Capital Account balances remaining at such time in proportion to such balances.

(d)     If a Partner unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations section 1.704-1(b)(2)(ii)(d)(4)-(6) that causes or increases a deficit balance in such Partner's Adjusted Capital Account, items of Partnership income and gain shall be allocated to that Partner in an amount and manner sufficient to eliminate the deficit balance as quickly as possible.

(e)     The allocations set forth in subsections (b), (c) (last sentence), and (d) (collectively, the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations that are made be offset either with other Regulatory Allocations or with special allocations pursuant to this Section 5.1(e). Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Adjusted Capital Account balance is, to the extent possible, equal to the Adjusted Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to the remaining sections of this Article V.

(f)     In accordance with Section 704(c) of the Internal Revenue Code and the Treasury Regulations thereunder, income and deductions with respect to any property carried on the books of the Partnership at an amount that differs from such property's adjusted tax basis shall, solely for federal income tax purposes, be allocated among the Partners in a manner to take into account any variation between the adjusted tax basis of such property to the Partnership and such book value. In making such allocations, the General Partner shall use such method of curative allocations as it may select pursuant to Treasury Regulations Section 1-704-3.

(g)     All items of income, gain, loss, deduction and credit allocable to any Units that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning those Units, without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under section 706 of the Internal Revenue Code and the applicable Treasury Regulations.

**Section 5.2. Special Allocations.** There shall be no special allocations.

-10-

**Section 5.3. <u>Distributions in Respect of the Units</u>.**

(a)     The Partnership may make distributions of cash or other properties to the Partners in respect of the Units from time to time as determined by the General Partner in accordance with the terms hereof.

(b)     Each Partner shall be entitled to receive a share of each distribution made to the Partners under this <u>Section 5.3</u> determined as follows:

(i)     first, to the Partners in proportion and to the extent necessary to cause the cumulative distributions to them pursuant to <u>Section 5.4</u> and this <u>Section 5.3(b)(i)</u> to be in accordance with their respective Unit Sharing Percentages; and

(ii)     thereafter, to the Partners in accordance with their respective Unit Sharing Percentages.

**Section 5.4. <u>Tax Distributions</u>**. Notwithstanding <u>Section 5.2</u> and <u>5.3</u>, as soon as conveniently possible after the end of each taxable period of the Partnership (but in no event sooner than the time the Partnership's accountants have determined the Partnership's income, gains, deductions, losses and credits for such taxable period with reasonable accuracy) cash distributions shall be made to the Partners in proportion to and to the extent of their respective Presumed Partnership Tax Liabilities to the extent sufficient cash reserves are available, as determined by the General Partner. For purposes of this <u>Section 5.4</u>, "Presumed Partnership Tax Liability" shall, as to each Partner for any given taxable period of the Partnership, be deemed to be equal to the product of (a) the excess, if any, of (i) the amount of the income and gain items reported or reportable on such Partner's Schedules K-1 (IRS Form 1065) with respect to the Units of the Partnership for such taxable period over (ii) the sum of the deduction and loss items reported or reportable on such Schedules K-1 for such taxable period and (b) the maximum effective federal individual income tax rate (as determined by the Partnership's accountants).

**Section 5.5. <u>Payment of Cash Distributions</u>**. Unless waived in writing by a Partner, payment of all cash distributions to the Partners under this Agreement shall be made by check.

## ARTICLE VI

### <u>Management/Governance Provisions; Liability, Limitations and Activities of Limited Partners</u>

**Section 6.1. <u>Power and Authority of the General Partner</u>.** Subject to the terms hereof, the General Partner shall have the sole and exclusive power and authority to manage the business of the Partnership and shall have all of the rights and powers which may be possessed by general partners under the Act, including, without limitation, the right and power to:

(a)     acquire by purchase, lease or otherwise any property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

(b)     operate, maintain, finance, improve, own, sell, convey, assign, mortgage and lease any property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership;

(c)     make and execute any and all agreements, contracts, promissory notes, loan agreements, security agreements, financing statements, collateral pledges, trust deeds, mortgages, deeds, easements, affidavits, leases, assignments, bills of sale, contracts, certifications, and other instruments necessary or convenient in connection with the acquisition, disposition, encumbrance, development, management, maintenance, and operation of any Partnership property, or in connection with managing the affairs of the Partnership, including executing amendments to this Agreement and the Certificate in accordance with the terms of this Agreement, pursuant to any power of attorney granted by the Limited Partners to the General Partner;

(d)     borrow money from third parties, the General Partner or any Limited Partner and issue evidences of indebtedness necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, and secure the same by mortgage, pledge, or other lien on any Partnership property;

(e)     prepay in whole or in part, refinance, increase, modify or extend any liabilities affecting Partnership property and in connection therewith execute any extensions or renewals of encumbrances on any Partnership property;

(f)     care for and distribute funds to the Partners by way of cash, income, return of capital or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership and this Agreement;

(g)     contract on behalf of the Partnership for the employment and services of employees and/or independent contractors (which may include any Partner or an Affiliate of any Partner), such as managers, advisors, lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Partnership;

(h)     engage in any kind of activity and perform and carry out contracts of any kind necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified;

(i)     take, or refrain from taking, all actions not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Partnership;

-12-

(j)    institute, prosecute, defend, settle, compromise and dismiss lawsuits or other judicial or administrative proceedings brought by or on behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith.

**Section 6.2    Right to Rely on General Partner**. Any Person dealing with the Partnership may rely (without duty of further inquiry) upon a certificate signed by the General Partner as to:

(a)    the identity of the General Partner;

(b)    the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a General Partner; or

(c)    the Persons who are authorized to execute and deliver any instrument or document of the Partnership.

The signature of an executive officer or other comparable representative of the General Partner shall be necessary and sufficient to convey title to any property owned by the Partnership or to execute any promissory notes, loan agreements, security agreements, financing statements, collateral pledges, trust deeds, mortgages, deeds, easements, contracts, certificates, affidavits, leases, assignments or other instruments of any kind.

**Section 6.3       Management fee.**    The Partnership shall pay to Terry McIver, for serving as the President of the General Partner, as a guaranteed payment pursuant to Section 707 of the Internal Revenue Code, a management fee in an amount set forth in an employment agreement to be agreed upon by the Partnership and a majority of the Board of Directors of the General Partner, subject to annual review by the Board of Directors.

**Section 6.4  Duties and Obligations of General Partner.**

(a)    The General Partner shall take all actions which may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Texas (and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged), (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation, and operation of any Partnership property in accordance with the provisions of this Agreement and applicable laws and regulations (iii) to comply in all material respects with the terms and provisions of all agreements to which the Partnership is a party or to which its properties are subject, (iv) to comply in all material respects with all applicable laws to which the Partnership is subject (including all applicable federal, state and local environmental laws), and (v) to obtain and maintain all licenses, permits, franchises, and other governmental authorizations required to be obtained and maintained

-13-

by the Partnership with respect to the ownership of Partnership properties and the conduct of Partnership business and operations.

(b)     The General Partner shall be under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership and of the Limited Partners, including the safekeeping and use of all Partnership property and the use thereof for the exclusive benefit of the Partnership.

**Section 6.5   Liability of Limited Partners.** No Limited Partner shall be liable for the debts, liabilities, contracts or other obligations of the Partnership except (a) to the extent of any unpaid Capital Contributions agreed to be made by such Limited Partner to the Partnership, (b) to the extent of such Limited Partner's share of the assets (including undistributed revenues) of the Partnership and (c) except as otherwise provided in the Act.

**Section 6.6   Limitations on Limited Partners.** Except as otherwise expressly provided herein, no Limited Partner, in its capacity as a limited partner of the Partnership, shall: (a) be permitted to take part in the business or control of the business or affairs of the Partnership; (b) have any voice in the management or operation of any Partnership property; or (c) have the authority or power to act as agent for or on behalf of the Partnership or any other Partner, to do any act which would be binding on the Partnership or any other Partner, or to incur any expenditures on behalf of or with respect to the Partnership; provided, that the foregoing shall not preclude the Affiliates or designees of a Limited Partner from serving on the Board of Directors of the General Partner and exercising any and all rights accorded to a Director of the General Partner by law, this Agreement and the articles of incorporation and bylaws of the General Partner.

## Section 6.7.Certain Agreements Regarding the Board of Directors of General Partner.

(a)     From and after the date hereof, the Board of Directors(or other governing body) of the General Partner shall be composed of five (5) individuals. Heartland shall have the right to designate three individuals to serve on the Board of Directors. Huntland Resources and Huntland Properties (jointly) shall have the right to designate two individuals to serve on the Board of Directors. The initial designees to the Board, as prescribed by the foregoing provisions of this subsection (a), are set forth in Exhibit 6.7. Immediately after the execution and delivery of this Agreement by the parties hereto, the Board of Directors of the General Partner shall be composed of such designees, each of whom shall serve until his successor is duly selected and qualified or until such individual's death, resignation or removal.

(b)     Directors will not be paid any fee for serving as Directors but will be entitled to reimbursement for reasonable out-of-pocket expenses in attending meetings of the Board.

**Section 6.8. Removal of Directors.** Any Director may be removed as a Director at any time and from time to time, with or without cause, by the Partner who designated such Director to serve on the Board. Except as provided in the immediately preceding sentence, a Director may not be removed.

**Section 6.9. Vacancies.** If a vacancy is created on the Board of Directors at any time by the death, disability, retirement, resignation or removal of a Director, the Partner that had designated such Director to serve as a Director shall have the sole and exclusive right to designate a replacement therefor.

**Section 6.10. Meetings of Board of Directors.** Regular meetings of the Board of which no notice shall be necessary, shall be held quarterly at such times and places as may be fixed from time to time by resolution adopted by the Board and communicated to all Directors. Except as otherwise provided by statute, the Certificate or this Agreement, any and all business may be transacted at any regular meeting.

**Section 6.11. Removal of General Partner.** The General Partner may be removed as a General Partner of the Partnership upon a Majority in Interest vote of Limited Partners. In such event, written notice of the removal of a General Partner shall be served upon it either by certified or registered mail, return receipt requested, or by personal service. Such notice shall set forth the date upon which the removal is to become effective. The Limited Partners holding a Majority in Interest may elect to continue the Partnership and select another person or entity as a substitute general partner at a special meeting of Limited Partners called for such purpose.

## ARTICLE VII

### Accounting and Banking Matters; Capital Accounts; Tax Matters

**Section 7.l. Books and Records.** The Partnership shall keep and maintain full and accurate books of account for the Partnership in accordance with generally accepted accounting principles consistently applied in accordance with the terms of this Agreement. Such books shall be maintained at the principal United States office of the Partnership.

**Section 7.2. Fiscal Year.** The calendar year shall be selected as the accounting year of the Partnership and the books of account shall be maintained on an accrual basis.

**Section 7.3. Bank Accounts.** The Partnership shall maintain one or more bank accounts in the name of the Partnership in such bank or banks as may be determined by the General Partner, which accounts shall be used for the payment of expenditures incurred by the Partnership in connection with the business of the Partnership and in which shall be deposited any and all receipts of the Partnership. All such receipts shall be and remain the property of the Partnership and shall not be commingled in any way with funds of any other Person.

-15-

**Section 7.4. Capital Accounts.**

(a)     A capital account shall be established and maintained for each Partner. Each Partner's capital account (a) shall be increased by (i) the amount of money contributed by that Partner to the Partnership, (ii) the fair market value of property contributed by that Partner to the Partnership (net of liabilities secured by the contributed property that the Partnership is considered to assume or take subject to under section 752 of the Internal Revenue Code), and (iii) the amount of any item of taxable income or gain and the amount of any item of income and gain exempt from tax allocated to such Partner for federal income tax purposes, and (b) shall be decreased by (i) the amount of money distributed to that Partner of the Company, (ii) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by the distributed property that the Partner is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Partner of expenditures of the Partnership described in section 705(a)(2)(B) of the Code, and (iv) allocations to that Partner of Partnership loss and deduction (or items thereof). The Partners' capital accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation sections 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Partners of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation section 1.704-1(b)(2)(iv)(g).

(b)     Notwithstanding the foregoing provisions of this Section 7.4, the Partners' capital accounts shall be adjusted on the date of this Agreement in the manner required under Treasury Regulation § 1.704-1(b)(2)(iv)(f) to reflect the fair market value of the Partnership's assets immediately prior to the date of this Agreement, which value shall be determined by reference to the Capital Contributions made to the Partnership for additional Units under Sections 4.2 and 4.3. Thereafter, the Partners' capital accounts shall be maintained and adjusted as permitted by the provisions of Treasury Regulation §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Partners of depreciation, depletion, amortization and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation § 1.704-1(b)(2)(iv)(g).

(c)     On the Disposition of all or part of a Partner's Units, the capital account of the transferor that is attributable to the transferred Units shall carry over to the transferee Partner in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(1).

**Section 7.5. Tax Partnership.** The Partners agree to classify the Partnership as a partnership for federal tax purposes. Neither the Partnership, the General Partner, any Partner nor any officer or other representative of any of the foregoing shall file an election to classify the Partnership as an association taxable as a corporation for federal tax purposes.

**Section 7.6. Tax Elections.** The Partnership shall make the following elections:

(a) To elect the calendar year as the Partnership's fiscal year if permitted by applicable law;

(b)To elect with respect to such other federal, state and local tax matters as the General Partner shall approve, as the best interests of the partners.

**Section 7.7. Tax Matters Partner.** The General Partner shall from time to time designate a Partner (which may be the General Partner) to act as the "tax matters partner" under Section 6231 of the Internal Revenue Code subject to replacement by the General Partner (such Partner, in this Section, being called the **"tax matters partner"**). The tax matters partner shall promptly notify the Partners if any tax return or report of the Partnership is audited or if any adjustments are proposed by any governmental body. In addition, the tax matters partner shall promptly furnish to the Partners all notices concerning administrative or judicial proceedings relating to federal income tax matters as required under the Internal Revenue Code. During the pendency of any such administrative or judicial proceeding, the tax matters partner shall furnish to the Partners periodic reports, not less often than monthly, concerning the status of any such proceeding. Without the unanimous consent of the Directors, the tax matters partner shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Partnership administrative adjustment or enter into any settlement agreement relating to any Partnership item of income, gain, loss, deduction or credit for any fiscal year of the Partnership.

## ARTICLE VIII

### Indemnification

**Section 8. 1.     Indemnification.**     To the fullest extent permitted by law, and subject to the procedures in Article 11 of the Act, on request by the Person indemnified the Partnership shall indemnify each General Partner, each Limited Partner, and the respective Affiliates, officers, directors, partners, members, managers, employees, and agents of each of the foregoing and hold them harmless from and against all losses, costs, liabilities, damages, claims, and expenses (including, without limitation, costs of suit and attorney's fees) any of them may incur as a General Partner (or as an Affiliate, officer, director, partner, member, manager, employee or agent thereof) in performing the obligations of that General Partner with respect to the Partnership, or as a Limited Partner arising out of its status as such (or as an Affiliate, officer, director, partner, member , manager, employee or agent thereof) in connection with the Partnership, SPECIFICALLY INCLUDING THE PERSON INDEMNIFIED'S SOLE, PARTIAL, OR CONCURRENT NEGLIGENCE, and on request by the Person indemnified the Partnership shall advance expenses associated with defense of any related action; provided, however, that this indemnity does not apply to actions constituting gross negligence, willful misconduct, an intentional violation of

-17-

applicable securities laws or material breach of this Agreement by the indemnified Person. The satisfaction of any defense or indemnification and any saving harmless shall be solely from the Partnership assets (which shall be converted to cash to the extent necessary in a manner appropriate to protect the interests of all Partners). To the extent such Partnership assets are less than the Partnership's obligations under this Section 8.1 (such difference being referred to herein as the **"Shortfall Amount"**), no Partner shall be required to make a Capital Contribution, loan, advance or other payment to fund such Shortfall Amount.

### ARTICLE IX
### Dispositions of Units

**Section 9.I. Dispositions**.

(a)     Except as specifically permitted in this Article IX, no Partner shall Dispose of all or any portion of such Partner's Units (or any interest therein) without the prior written consent of all Partners, which consent may be withheld for any reason or for no reason.

(b)     Notwithstanding the terms of Section 9.1(a) to the contrary:

(i)     any Partner who is an individual may assign all or part of his Units during his lifetime or upon his death pursuant to his will or by intestate succession, for value, as a gift or otherwise, to (A) such Partner's spouse, children (including adopted and step-children), grandchildren, sisters, brothers, father, mother, father-in-law, mother-in-law, son-in-law or daughter-in-law or (B) an inter vivos trust or any other entity the majority of the beneficial interests in which are held exclusively, directly or indirectly, by the individual Partner or any Person described in the preceding clause (A), provided that in each instance the assignee agrees in writing to be bound by the provisions of this Agreement as if such assignee were an original signatory hereto.

(ii)     any Partner that is a corporation, partnership or other entity may assign all or part of its Units to any Affiliate of the assignor Partner of which the assignor Partner owns, directly or indirectly, 80% or more of the ownership interests and over which the assignor Partner has effective control, provided that in each instance the assignee agrees in writing to be bound by the provisions of this Agreement as if such assignee were an original signatory hereto.

(iii)     (intentionally left blank)

(iv)     (intentionally left blank)

(v)     Upon dissolution of any Limited Partner, the Units then held by such Limited Partner may be assigned to the partners of the Limited Partner, provided that the assignees agree in writing to be bound by the provisions of this Agreement as if such assignees were original signatories hereto.

-18-

(c)     Every Disposition shall be subject to all of the terms, conditions, restrictions and obligations set forth in this Agreement.

(d)     The transferee of an interest in the Partnership transferred pursuant to this Article IX that is admitted to the Partnership as a substitute Partner as provided in Section 9.5 hereof shall succeed to the rights and liabilities of the transferor Partner and, after the effective date of such admission, the Capital Contribution and Capital Account of the transferor shall become the Capital Contribution and Capital Account, respectively, of the transferee, to the extent of the interest transferred.

(e)     The admission of a transferee as a substitute Partner shall become effective on the date an amendment to reflect the transferred Units is duly recorded in the Partnership's records. Upon the admission of a substitute Partner, the appropriate Exhibits to this Agreement shall be amended to reflect, among other matters, the name and address of the substitute Partner.

(f)     Any attempted Disposition or withdrawal in contravention of any of the provisions of this Agreement shall be void ab initio and shall not bind or be recognized by the Partnership, the General Partner or the Partners.

(g)     Any costs incurred by the Partnership in connection with any Disposition by a Partner of all or a part of its Units shall be borne by such Partner.

(h)     Notwithstanding anything herein to the contrary, the terms and provisions of this Section 9. 1 shall not be deemed to be applicable to a sale of all of the outstanding Units pursuant to Section 9.4.

### Section 9.2  Right of First Refusal.

(a)     If a Partner (the **"Disposing Partner"**) desires to Dispose of all or any part of his Units (the **"Subject Units"**) by any means whatsoever (other than a Disposition described in Section 9.1(b) above or any merger, consolidation or other transaction that is permitted by Section 6.3(a)(xiv) hereof), then the Disposing Partner shall give written notice thereof (the **"Voluntary Transfer Notice"**) to the Partnership and to each holder of Units (the **"Eligible Partners"**), which notice shall set forth the proposed price (the **"Voluntary Transfer Price"**) and the terms of payment for the Subject Units (the **"Voluntary Transfer Terms"**). The Voluntary Transfer Notice shall constitute an offer by the Disposing Partner to the Partnership and the Eligible Partners to sell the Subject Units at the Voluntary Transfer Price and on the Voluntary Transfer Terms.

(b)     The Partnership shall have the right, exercisable within thirty (30) days after the receipt of the Voluntary Transfer Notice by sending written notice of acceptance to the Eligible Partners and to the Disposing Partner, to purchase all or any portion of the Subject Units. The Partnership's written acceptance shall establish a date, within ninety (90) days but not less than ten (10) days after receipt of the Voluntary Transfer Notice, for the closing of the purchase and sale of the Subject Units.

-19-

(c)     If the Partnership does not purchase all of the Subject Units pursuant to Section 9.2(b) above, then the Eligible Partners shall have the right, exercisable within sixty (60) days after the Partnership's receipt of the Voluntary Transfer Notice by sending written notice of acceptance to the Partnership and to the Disposing Partner, to purchase the remaining Subject Units. If more than one Eligible Partner desires to purchase the remaining Subject Units, then such Subject Units shall be purchased by them in such proportions as they may agree. In the absence of agreement, the remaining Subject Units shall be allocated to each Eligible Partner desiring to purchase them pro rata based on the number of Units held by such Eligible Partner. If one or more Eligible Partners elect to purchase Subject Units pursuant to this Section 9.2(c), then the closing shall be held on the date established by the Partnership pursuant to Section 9.2(b) above, or, if the Partnership has elected not to purchase any of the Subject Units, on a date established by the written agreement of the Disposing Partner and a majority (in number) of the Eligible Partners, which closing date shall be within ninety (90) days but not less than ten (10) days after the Partnership's receipt of the Voluntary Transfer Notice.

(d)     On the date of closing, the Disposing Partner shall sell, and the Partnership and/or the Eligible Partners shall purchase, the Subject Units subscribed for in Section 9.2(b) and Section 9.2(c) above, at the Voluntary Transfer Price and upon the Voluntary Transfer Terms. The closing shall be held at the principal office of the Partnership.

(e)     The Disposing Partner may Dispose of any Subject Units that are not purchased by the Partnership and/or the Eligible Partners pursuant to the provisions of this Section 9.2, but only for the Voluntary Transfer Price and upon the Voluntary Transfer Terms as set forth in the Voluntary Transfer Notice and only if the Disposing Partner first complies with the requirements of Section 9.3 below.

(f)     If any Units of a Partner shall be attached or levied upon by judicial process and such attachment or levy shall not be promptly removed and abated, or if a Partner shall attempt to Dispose of any of its Units without complying with the provisions of this Article IX, then such Partner shall be deemed to have given a **"Voluntary Transfer Notice"** to the Partnership and the Eligible Partners under Section 9.2(a) above covering all of such Partner's Units (which shall be **"Subject Units"** for purposes of this Section 9.2) at a time immediately prior in time to such attachment, levy or attempt to Dispose, which notice shall become effective at such time as the Partnership shall have actual notice of such attachment, levy or attempt to Dispose. Within thirty (30) days after the Partnership shall have actual notice of such attachment, levy or attempted Disposition, it shall cause written notice thereof to be sent to all Eligible Partners. The **"Voluntary Transfer Price"** for such Partner's Units shall be the amount paid by such Partner for such Units, and the terms of Section 9.2(a) through Section 9.2(d) above shall apply to all such Units.

-20-

**Section 9.3 Tag-Along Rights.**

If, at any time, any Partner or group of Partners (individually or collectively, the **"Seller"**) proposes to enter into any transaction, or series of related transactions, involving the Disposition of Units (other than a Disposition described in Section 9.1(b) above or any merger, consolidation or other transaction that is permitted by Section 6.3(a)(xiv) hereof), then the Seller shall first comply with the provisions of Section 9.2 above. If all of the Units proposed to be Disposed are not acquired by the Partnership and/or the Eligible Partners pursuant to Section 9.2 above, then the Seller shall give to each Partner written notice (the **"Co-Sale Notice"**), at least fifteen (15) days in advance of the proposed Disposition or the date that such tender is required, of such Partner's opportunity to sell its Pro Rata Share (as defined below) of the total number of Units to be purchased by the proposed transferee (the **"Co-Sale Units"**), on the same terms and conditions (including price) applicable to the Co-Sale Units to be sold by the Seller (the Co-Sale Notice shall state the total number of Co-Sale Units to be purchased by the proposed transferee and shall describe in detail the other terms and conditions of the proposed Disposition). A Partner may exercise its right to participate in the proposed Disposition by giving written notice to the Seller within ten (10) days after such Partner's receipt of the Co-Sale Notice. A Partner's **"Pro Rata Share"** for purposes of this Section 9.3 means a fraction, the numerator of which is the number of Units held by such Partner at the time of the proposed Disposition, and the denominator of which is the total number of Units held by the Seller and the Partners at the time of the proposed Disposition.

All Dispositions under this Section 9.3 shall be subject to the provisions of Section 9.5 below.

**Section 9.4 Drag-Along Rights.**

(a) If at any time, the holders of more than forty percent (40%) of the outstanding Units (the **"Receiving Partners"**) have received a bona fide written cash offer from an unaffiliated purchaser or group of unaffiliated purchasers (the **"Offer"**) (x) to purchase all of the Partnership's outstanding Units or (y) to purchase all or substantially all of the Partnership's assets (other than by way of any merger, consolidation or similar transaction), the Receiving Partners shall have the right to (1) in the case of a transaction described in the immediately preceding clause (x), require each holder of Units to make an election to either sell all of its Units to such unaffiliated purchaser or group of purchasers on the same terms and conditions applicable to, and for the same purchase price payable to, the Receiving Partners, or reject the proposal, and (2) in the case of a transaction described in the immediately preceding clause (y), require each holder of Units to make an election to either approve and cause the Partnership to consummate such transaction or reject the proposal.

(b) If the Receiving Partners desire to enter into any transaction, or series of related transactions, involving the sale of all or substantially all of the Partnership's assets or the sale of all of the Partnership's outstanding Units in a transaction described in

-21-

paragraph (a) of this Section 9.4, then the Receiving Partners may, but shall not be obligated to, give to all other Partners (the **"Electing Partners"**) a notice describing in detail all of the terms and conditions of the Offer (including a copy of the Offer) and stating that such notice is being delivered pursuant to this Section 9.4 (the **"Election Notice"**).

(c)     Within thirty days after the last date on which each Electing Partner has received an Election Notice ( the **"Election Period"**), each Electing Partner shall deliver to the Receiving Partners its written election to either accept the Offer or reject the Offer. Failure to deliver an election within the Election Period shall be deemed to be a rejection of the Offer. If an Electing Partner rejects the offer (a **"Rejecting Partner"**), such Rejecting Partner shall then be obligated to purchase (upon the equivalent terms and conditions as set forth in the Offer) the Units of the Receiving Partners and any Electing Partner who has elected to accept the Offer for cash at a purchase price equal to 100% of the cash purchase price stated in the Offer, multiplied by the Unit Sharing Percentage of each such Receiving Partner and Electing Partner that has accepted the Offer. If there shall be more than one Rejecting Partner, the obligation to purchase the Units of the Receiving Partner and the Electing Partners who have accepted the Offer shall be borne pro rata among the Rejecting Partners, based on a fraction the numerator which is the number of Units owned by each Rejecting Partner and the denominator of which is the number of Units owned by all Rejecting Partners.

(d)     If one or more Rejecting Partners are required to purchase Units pursuant to this Section 9.4, then the closing shall be held on the date established by the Receiving Partners, which closing date shall be within thirty days but not less than twenty days after the end of the Election Period.

(e)     Each Partner hereby covenants and agrees to take such steps and execute such documents as may be necessary, appropriate or desirable to effectuate the provisions of this Section 9.4.

### Section 9.5. Substitution.

(a)     Unless an assignee of Units becomes a Partner in accordance with the provisions set forth below, such assignee shall not be entitled to any of the rights granted to a Partner hereunder in respect of such Units, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions to which the assignor would otherwise be entitled, to the extent such items are assigned.

(b)     An assignee of the Units of a Partner, or any portion thereof, shall become a substitute Partner entitled to all of the rights of a Partner in respect of such Units if, and only if (i) the assignor gives the assignee such right, (ii) the other Partners consent to such substitution (which consent shall not be unreasonably withheld, conditioned or delayed) and (iii) the assignee executes and delivers such instruments, in form and substance reasonably satisfactory to the other Partners, as the other Partners may deem reasonably necessary to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

-22-

**Section 9.6.** **Change in Control or Change of Key Personnel.** The General Partner may not cause or permit an interest, direct or indirect, in itself to be Disposed of such that, after such Disposition, without the consent of the Limited Partners, in its sole and absolute discretion, the General Partner shall cease to be controlled (more than 50%) by substantially the same Persons who control it as of the date of this Agreement.

**Section 9.7 Death, Legal Incompetency, or Dissolution of Limited Partner.** The death, legal incompetency, dissolution or other disability of a Limited Partner shall not dissolve or terminate the Partnership. Upon the death or legal incompetency of a Limited Partner, the estate, personal representative, guardian or other successor in interest of such Limited Partner shall have all the rights, shall be liable for all the Partnership liabilities of such Limited Partner, and, with the prior written consent of the General Partner, may be substituted for such Limited Partner.

## ARTICLE X

### Dissolution, Liquidation and Termination

**Section 10.1.** **Dissolution.** The Partnership shall dissolve and its affairs shall be wound up on the first to occur of the following:

(a) the fortieth (40th) anniversary of the date of this Agreement;

(b) the sale or other disposition of all or substantially all of the assets of the Partnership to any other Person in which the Partners do not own a majority of the outstanding voting securities of such other Person, unless the Partners otherwise agree;

(c) the merger or consolidation of the Partnership, the conversion of the Partnership into another form of entity or the exchange of Partnership interests, in each case with or into any other Person in which the Partners do not own a majority of the outstanding voting securities of such other Person, unless the Partners shall otherwise agree;

(d) entry of a decree of judicial dissolution of the Partnership under Section 8.01 of the Act; or

**Section 10.2.** **Liquidation and Termination.** On dissolution of the Partnership, the liquidator shall be a Person selected by the General Partner. The liquidator shall proceed diligently to wind up the affairs of the Partnership and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Partnership expense. Until final distribution, the liquidator shall continue to manage the Partnership with all of the power and authority of the General Partner. The steps to be accomplished by the liquidator are as follows:

∪

(a)     As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Partnership's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)     The liquidator shall pay, satisfy or discharge from Partnership funds all of the debts, liabilities and obligations of the Partnership (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

(c)     All remaining assets of the Partnership shall be distributed to the Partners as follows:

(i)     the liquidator may sell any or all Partnership property and any resulting gain or loss from each sale shall be computed and allocated to the capital accounts of the Partners as provided in Section 5.1;

(ii)     with respect to all Partnership property that has not been sold, the fair market value of that property shall be determined and the capital accounts of the Partners shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the capital accounts previously would be allocated among the Partners under Section 5.1 if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)     Partnership property shall be distributed among the Partners in the amounts specified in Sections 5.2 and 5.3.

All distributions in kind to the Partners shall be valued for purposes of determining each Partner's interest therein at its fair market value at the time of such distribution, and such distributions shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Partnership has committed prior to the date of termination, and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 10.2. It is intended that the foregoing distributions to each Partner will be equal to each Partner's respective positive capital account balance as determined after giving effect to the foregoing adjustments and to all adjustments attributable to allocations of items of income, gain, loss and deduction realized by the Partnership during the taxable year in question and all adjustments attributable to contributions and distributions of money and property effected prior to such distribution. To the extent that any such Partner's positive capital account balance does not correspond to such distribution, the allocations provided for in Section 5.1 shall be adjusted, to the least extent necessary, to produce a capital account balance for the Partner which corresponds to the amount of such distribution.  Any distribution to the Partners in liquidation of the Partnership shall be made by the later of the end of the taxable year in

-24-

which the liquidation occurs or 90 days after the date of such liquidation. For purposes of the preceding sentence, the term "liquidation" shall have the same meaning as set forth in Treasury Regulation § 1.704-l(b)(2)(ii). The distribution of cash and/or property to a Partner in accordance with the provisions of this Section 10.2 constitutes a complete return to the Partner of its Capital Contribution and a complete distribution to the Partner of its Units and all the Partnership's property and constitutes a compromise to which all Partners have consented within the meaning of Section 5.02 of the Act. To the extent that a Partner returns funds to the Partnership, it has no claim against any other Partner for those funds.

**Section 10.3      Deficit Capital Accounts**. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, no Partner shall be obligated to restore a deficit balance in such Partner's capital account at any time.

**Section 10.4      Certificate of Cancellation**. On completion of the distribution of Partnership assets as provided herein, the Partnership shall be terminated and the Partners shall file a certificate of cancellation with the Secretary of State of Texas, cancel any other filings made pursuant to Section 1.5, and take such other actions as may be necessary to terminate the Partnership.

## ARTICLE XI

### Representations and Warranties

**Section 11.1.      Representations and Warranties of Partners to Each Other**. Each Partner hereby severally (and not jointly or jointly and severally) as to itself only represents and warrants to the other Partners as follows:

(a)      Such Partner (if not an individual) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.

(b)      Such Partner, if an individual, is not a minor and has the requisite legal capacity to execute and deliver this Agreement and to perform his or her obligations hereunder.

(c)      Such Partner has the requisite power and authority to execute and deliver this Agreement and to perform such Partner's obligations hereunder.

(d)      The execution, delivery and performance by such Partner (if not an individual) of this Agreement has been duly and validly authorized by all requisite limited liability company, partnership or corporate (as applicable) action.

(e)      The execution, delivery and performance by such Partner of this Agreement (i) (if not an individual) is within its limited liability, partnership or corporate (as applicable) powers and (ii) will not (A) be in contravention of or violate any provisions of its charter or other governing documents, as amended to the date hereof in the instance of a Partner

-25-

not an individual), or (B) be in contravention of or result in any breach or constitute a default under any applicable law, rule, regulation, judgment, license, permit or order or any loan, note or other agreement or instrument to which such Partner is a party or by which it or any of its properties are bound.

(f)     When delivered to the other Partners, this Agreement will have been duly and validly executed and will be binding upon such Partner and enforceable in accordance with the terms hereof.

(g)     No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Partner of this Agreement.

(h)     Such Partner nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein; and such Partner shall indemnify and hold harmless the Partnership and the other Partners from any costs, including attorneys' fees, and liability arising from the claim of any broker, agent or finder employed or retained by such Partner in connection with the Partnership or this Agreement.

(i)     Such Partner is not in default or breach of any agreement to which such Partner is a party or by which its properties are bound.

(j)     There is no pending or, to such Partner's knowledge (after due inquiry), threatened judicial, administrative or arbitral action, suit or proceeding against or investigation of such Partner or its ability to perform its obligations under this Agreement.

**Section 11.2. Survival of Representations and Warranties.** All representations, warranties and covenants made by each of the Partners in this Agreement or any other document contemplated thereby or hereby shall be considered to have been relied upon by the other party hereto and shall survive the execution and delivery of this Agreement or such other document, regardless of any investigation made by or on behalf of any such party.

## ARTICLE XII

### General Provisions

**Section 12.l.     Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the

-26-

United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Partner must be sent to or made at the addresses given for that Partner on Exhibit 3.2(c) or such other address as that Partner may specify by notice to the other Partners. All notices, requests and consents to be sent to the Partnership must be sent to or made at the address of the Partnership's principal place of business as the Partnership may specify by notice to the Partners.

**Section 12.2.** **Amendment or Modification.** This Agreement may be amended or modified from time to time only by a written instrument executed and agreed to by all of the Partners.

**Section 12.3.** **Entire Agreement**. This Agreement constitutes the full and complete agreement of the parties hereto with respect to the subject matter thereof. Without limitation of the foregoing, this Agreement supersedes in its entirety the Original Partnership Agreement and all amendments, modifications or changes thereto.

**Section 12.4.** **Effect of Waiver or Consent**. The failure of any Person to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Person's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

**Section 12.5.** **Successors and Assigns.** Subject to Article IX, this Agreement shall be binding upon and inure to the benefit of the Partners and their respective heirs, legal representatives, successors and assigns.

**Section 12.6** **Governing Law. THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.**

**Section 12.7.** **Severability.** If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

-27-

**Section 12.8.** **Further Assurances**. In connection with this Agreement and the transactions contemplated hereby, each Partner shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.9.** **Title to Partnership Property**. All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership, and no Partner, individually, shall have any ownership of such property. The Partnership shall hold all of its property in its own name.

**Section 12.10.** **Public Announcements**. The Partnership or any Partner may issue a press release or other public statement with respect to this Agreement or the transactions contemplated hereby only after having providing reasonable advance notice of same to the other Partners.

**Section 12.11.** **No Third Party Beneficiaries**. Except as otherwise provided in Section and in Article VIII it is the intent of the parties hereto that no third-party beneficiary rights be created or deemed to exist in favor of any Person not a party to this Agreement, unless otherwise expressly agreed to in writing by the parties.

**Section 12.12.** **Survival**. The covenants and agreements of the parties hereto shall not survive the termination of the Partnership and the filing of a certificate of cancellation with the Secretary of State of Texas.

**Section 12.13.** **Counterparts**. This Agreement may be executed in any number of counterparts, with each such counterpart constituting an original and all of such counterparts constituting but one and the same instrument.

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the date first above written.

**GENERAL PARTNER**

Brady Plant Operators, L.L.C.

By: _____
Terry McIver, President

-28-

## **LIMITED PARTNERS**

P.O. Box 5562
Midland, Texas 79704

Heartland Investment Partners, Ltd.
By: Western Green Oaks Corp

By: _____
Cary D. Brown, Vice President

P.O. Box 519
Santa Anna, Texas 76878

Huntland Resources, LLC.

By: _____
Terry McIver, President

P.O. Box 519
Santa Anna, Texas 76878

Huntland Properties, Ltd.
By: Cornerstone Operating, L.L.C.

By: _____
Terry McIver, President

P.O. Box 469
Brady, Texas 76825

J Bar T, Ltd.
By: KDLT Resources, LLC

By: _____
Donald Barley, President

P.O. Box 42
Coleman, Texas 76834

Window Operating Company, Ltd.
By: Oak Tree Enterprises, L.L.C.

By: _____
Mike Ray, President

## Exhibit 3.1

| Name of Partner | Classification |
| --- | --- |
| Brady Plant Operators, L.L.C | General Partner |
| Heartland Investment Partners, Ltd | Limited Partner |
| Huntland Resources, Ltd. | Limited Partner |
| Huntland Properties, Ltd. | Limited Partner |
| Window Operating, Ltd. | Limited Partner |
| J Bar T, Ltd | Limited Partner |

## Exhibit 3.2(c)

| Partners | Address For Notice Purposes | Units | Capital Contribution |
|---|---|---|---|
| Brady Plant Operators, L.L.C. | P.O. Box 519 Santa Anna, Texas | 100 | $6,000 |
| Heartland Investment Partners, Ltd | P.O. Box 5562 Midland, Texas 79704 | 4,500 | $270,000 |
| Huntland Resources, LLC. | P.O. Box 519 Santa Anna, Texas 76878 | 3,000 | $180,000 |
| Huntland Properties, Ltd | P.O. Box 519 Santa Anna, Texas 76878 | 900 | $54,000 |
| Window Operating, Ltd. | P.O. Box 42 Coleman, Texas 76834 | 500 | $30,000 |
| J Bar T, Ltd | P.O. Box 469 Brady, Texas 76825 | 1,000 | $60,000 |
|  |  | 10,000 | $600,000 |

## Exhibit 3.2(d)

**THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN AGREEMENT OF LIMITED PARTNERSHIP, DATED AS OF NOVEMBER __, 2004(AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT ITS PRINCIPAL EXECUTIVE OFFICES.**

Certificate of Units in Loadcraft Industries, Ltd

Certificate No. _____                                        _____ Units

LOADCRAFT INDUSTRIES, LTD., a Texas limited partnership (the "Partnership"), hereby certifies that _____ (the "Holder") is the registered owner of _____ Units in the Partnership (the "Units"). The rights, preferences and limitations of the Units are set forth in that certain Agreement of Limited Partnership of the Partnership dated as of November __, 2004, as amended, supplemented or restated from time to time (the "Agreement"), a copy of which is on file at the principal office of the Partnership.

This Certificate and the Units evidenced hereby are not negotiable or transferable except as provided in the Agreement.

Dated: _____                    LOADCRAFT INDUSTRIES, LTD.

By: Brady Plant Operators, L.L.C..,
    its general partner

By: _____
    Terry McIver, President

**THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACRE OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE PARTNERSHIP SHALL HAVE BEEN DELIVERED TO THE PARTNERSHIP TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT). THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN AGREEMENT OF LIMITED PARTNERSHIP, DATED AS OF NOVEMBER __, 2004 (AS SUCH AGREEMENT MAY BE AMENDED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE PARTNERSHIP AT IS PRINCIPAL EXECUTIVE OFFICES.**

## Exhibit 3.3

### Schedule of Additional Units

|  | Initial Units | Initial Sharing % | 0-6 months | New Sharing % | 7-12 months | New Sharing % | 12+ months | New Sharing % |
|---|---|---|---|---|---|---|---|---|
| GP | 100 | 1.00% | 100 | 0.90% | 100 | 0.80% | 100 | 0.70% |
| Huntland Resources | 3,000 | 30.00% | 3,000 | 27.00% | 3,000 | 24.00% | 3,000 | 21.00% |
| Huntland Properties | 900 | 9.00% | 900 | 8.10% | 900 | 7.20% | 900 | 6.30% |
| Heartland Investments | 4,500 | 45.00% | 5,610 | 50.50% | 7,000 | 56.00% | 8,785 | 61.50% |
| Window Operating | 500 | 5.00% | 500 | 4.50% | 500 | 4.00% | 500 | 3.50% |
| JBarT | 1,000 | 10.00% | 1000 | 9.00% | 1,000 | 8.00% | 1,000 | 7.00% |
|  | 10,000 | 100% | 11,110 | 100.00% | 12,500 | 100.00% | 14,285 | 100.00% |

| Additional Units to be Issued to Heartland |  | 1,110 |  | 1,390 |  | 1,785 |

## Exhibit 6.7

### Initial Board of Directors of General Partner

•

<u>Designated by Heartland (3)</u>

Cary D. Brown

Dale A. Brown

W. Stirling Warren


<u>Designated by Huntland Resources and Huntland Properties (2)</u>

Terry McIver

Donald Barley